April Evans HOUSE, et al., Plaintiffs,

v.

NEW CASTLE COUNTY,
et al., Defendants.

Civ. A. No. 92–03–LON.

United States District Court,
D. Delaware.

May 27, 1993.

478

Scott A. Stanley, Law Offices of Sylvia E. Hall, Wilmington, DE, for plaintiffs.

Barry M. Willoughby, and Bhavana Sontakay, of Young, Conaway, Stargatt & Taylor, Wilmington, DE, Julie M.S. Sebring, New Castle County Law Dept., Wilmington, DE, for defendants.

## OPINION

LONGOBARDI, Chief Judge.

### I. NATURE AND STAGE OF THE PROCEEDINGS

On January 2, 1992, the Plaintiffs in this action, April Evans House ("Mrs. House") and Keven A. House ("Mr. House"), individually, and April Evans House as next friend of Ameera Evans ("Ameera"), a minor, filed suit against numerous Defendants for the alleged deprivation of Plaintiffs' constitutional and common law rights. Docket Item ("D.I.") 1.

Specifically, the Plaintiffs seek compensatory and punitive damages from Defendants New Castle County Government ("Government"), New Castle County Police Department ("Police Department"), Colonel Thomas P. Gordon ("Gordon") individually and in his official capacity as Colonel of the New Castle County Police Department and Patrolman Anthony Scelsi ("Scelsi"), individually and in his official capacity as a police officer for New Castle County.[1]

Plaintiffs' suit stems from a confrontation with the New Castle Police Department occurring on December 31, 1989, in which the police were summoned to the residence of the Plaintiffs in response to a disturbance involving loud radio playing. Plaintiff April House was detained and subsequently arrested for disorderly conduct, assault, resisting arrest, menacing, offensive touching and terroristic threatening. D.I. 1, ¶ 23.[2] In the first instance, Plaintiffs' fundamental claim is that during the course of Mrs. House's arrest, Defendant Scelsi employed excessive force causing her to suffer severe physical and emotional damages.

Plaintiffs contend that Mrs. House willingly complied with the request from the Patrolmen to lower the radio.[3] Despite her cooperation, she alleges Defendant Scelsi was dissatisfied with the Plaintiffs' attitude and violently forced his way back into the Plaintiffs' apartment threatening to arrest Plaintiff Mrs. House. D.I. 1 at ¶¶ 8–10.[4] More sig-

---

**1.** In so much as one of the counts in Plaintiffs' Complaint raises the specter of race discrimination, D.I. 1, ¶ 34 (Count II), the Court notes initially that the Plaintiffs in this action are black individuals while Defendant Scelsi is a white individual.

**2.** Mrs. House pleaded guilty to the charge of disorderly conduct and received an Attorney General's probation for six months with all other charges being dropped. Her husband, Keven House, was ultimately found guilty after a trial by jury on the charge of disorderly conduct.

**3.** In their Answering Brief to Defendants' Motion for Summary Judgment, Plaintiffs' claim in their statement of facts that an Officer Liebesman present with Defendant Scelsi on the night of the incident told the Plaintiffs to "turn down the F * * * * * * music." D.I. 52 at 9; D.I. 53 at 62 (claims that when the Plaintiffs opened the door, Officer Liebesman told them to "[t]urn the

f * * * * * * * music down or I am going to take your ass down town") (deposition of Mr. House). This characterization of the initial events in the Plaintiffs' apartment is absent from the Plaintiffs' Complaint which simply states that upon arriving at the Plaintiffs' apartment, the officers advised the Plaintiffs of the complaint regarding the radio playing. D.I. 1, ¶ 6.

Additionally, the Court notes for the record that the Plaintiffs and the Defendants have submitted vastly different versions in their respective statements of the facts as relates to the incident in question. The Court specifically examines those differences at Section III(C)(1), *infra*.

**4.** Plaintiffs aver in their Complaint that when Mrs. House began to close the door after courteously and politely responding to the officers request to lower the volume on the radio, Defendant Scelsi prevented the door from being shut with a flashlight and violently pushed the door back open. D.I. 1, ¶¶ 8, 9.

nificantly, Plaintiffs contend that Patrolman Scelsi became physically abusive as to both her and her daughter, Ameera, when Mrs. House questioned why Defendant Scelsi had forced open the door and why he would arrest her. *Id.*, ¶ 10.

In particular, Plaintiffs allege that Officer Scelsi forcibly placed Mrs House's arm behind her back and that her seven year old daughter, Ameera, scared that this man was grabbing her mother, began to cry and approached the officer. *Id.*, ¶¶ 11, 12. According to the Plaintiffs, it was at this point that Defendant Scelsi viciously shoved Plaintiff Ameera backwards into a table and then, without determining whether she was injured, forcibly directed Mrs. House to the patrol car despite the fact that she was not fully clothed. *Id.*, ¶¶ 13, 14. Plaintiffs contend that in directing Mrs. House, Officer Scelsi repeatedly struck her with his knee in the buttocks causing her to scream out in pain and fear. *Id.*, ¶ 16. Plaintiffs allege that in response to her mother's cries, Plaintiff Ameera ran towards Officer Scelsi and that he once again violently shoved her backwards causing her to crash into the railing in the hallway. *Id.*, ¶ 17. Further, Plaintiffs allege that at this point, Officer Scelsi violently pushed Mrs. House towards a corner of the landing and when she struggled to avoid being pushed into the concrete block on the landing, Defendant Scelsi fired his stun gun at her three times. *Id.*, ¶ 18.[5]

In total, the Plaintiffs have raised (1) civil rights violations under 42 U.S.C. §§ 1983,

1985 and 1988 claiming that the Defendants violated their constitutional rights under the fourth, fifth and fourteenth amendments to the constitution; and (2) violations under Delaware state law for assault, battery, infliction of emotional distress and loss of consortium. *See generally,* D.I. 1. The federal claims are generally encompassed by Counts I, II and IV of the Complaint. Fundamental to each of those Counts is the underlying allegation that Defendant Officer Scelsi violated the Plaintiffs' constitutional and civil rights by his physical abuse of Mrs. House.

Count I of the Complaint indicates that the procedures used by the New Castle Police Department in some way violated the due process and equal protection rights of the Plaintiffs. Particularly, the Plaintiffs allege that their rights were violated because the force used against Mrs. House was excessive, the use of force against Ameera was excessive and that the institution of charges by an Officer to justify the use of force was improper. *Id.*, ¶¶ 26–29 (Count I). Count II alleges that the unlawful acts of which they complain reflect the customs, policies and procedures of the Defendants.[6] Additionally, Counts II and IV allege that the Defendants affirmatively engaged in a conspiracy (1) to deprive the Plaintiffs their due process rights and other civil rights guaranteed by the Constitution and (2) to impede the due course of justice in violation of the fifth and fourteenth amendments and 42 U.S.C. § 1983 and § 1985. *Id.*, ¶ 32 (Count II); *Id.*, ¶¶ 42–44

---

5. Plaintiffs' claim that both Mrs. House and Ameera have suffered physical and emotional trauma as a result of this incident. *Id.*, ¶¶ 21, 22. In particular, Plaintiffs contend that during her contact with Officer Scelsi at the time of the incident, Mrs. House momentarily blacked out, D.I. 52 at 11, and that as a result of the incident she sustained burn marks, a bruise across her shoulder blade and has sought spiritual counseling. *Id.* at 12. Additionally, Plaintiffs allege that as a result of this incident, Plaintiff Ameera suffered a bruise and broken skin on her back and now exhibits a fear of police. *Id.*

6. Particularly, it is the Plaintiffs' position that Defendants, Government, Police Department and Gordon, in his official capacity, maintained a custom or policy (1) that encouraged the alleged excessive force by Officer Scelsi when Defendants knew or should have known that Officer

Scelsi should not be allowed to arrest individuals; (2) failed to adequately train their police officers to use only reasonable force when necessary; to insure that witnesses to an arrest are not purposely harmed; to insure that children are not harmed by an officer's actions; and, to adequately train an officer as to how to use a stun gun; (3) that inflicted harm upon black suspects for no just reason other than the fact that they are black; and (4) that allows officers with a history of problems with black citizens to become involved with blacks alone. D.I. 1, ¶ 34. Additionally, Plaintiffs aver that the policy promoted by these Defendants caused Defendant Scelsi to reasonably believe that in making arrests he could employ excessive force with impunity because complaints of illegal arrest and excessive force would not be thoroughly and fairly investigated. *Id.*, ¶ 35.

(Count IV).[7]

■ Counts III, V, VI, VII and VIII of the Complaint all fall liberally under the umbrella of the state law of Delaware. The Court recognizes that the Defendants do not raise a pure jurisdictional challenge to this Court's ability to resolve these state law claims.[8] A review of the total record leads this Court to agree with the Plaintiffs' contention that all of the various state law claims here arise out of the same nucleus of operative facts as the federal claims such that judicial economy necessitates that all the claims be tried in one proceeding. These state law claims are therefore properly tried before this Court in accordance with the federal provision for supplemental jurisdiction authorizing federal courts to preside over state law claims otherwise lacking an independent jurisdictional basis. 28 U.S.C. § 1367.[9]

Presently before this Court is a Motion for Summary Judgment filed collectively by all the Defendants in this matter. D.I. 49.

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact that can be resolved at trial and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Materiality is determined by the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A dispute is "genu-

ine" only if a reasonable jury could return a verdict for the nonmoving party. *Id.* Following a determination that no genuine dispute of material facts exists, the moving party must demonstrate that it is entitled to judgment as a matter of law.

Once the moving party has made and supported its motion, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. Additionally, "a non-moving party must adduce more than a mere scintilla of evidence in its favor, ... and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3rd Cir.1989) (citing *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510 and *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553).

Any doubts as to the existence of genuine issues of fact will be resolved against the moving party and all inferences to be drawn from the material it submits will be viewed in the light most favorable to the party opposing the motion. *Norfolk Southern Corp. v. Oberly*, 632 F.Supp. 1225, 1231 (D.Del.1986) (citing *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)), *aff'd*, 822 F.2d 388 (3rd Cir.1987). If the evidentiary record supports a reasonable inference that the ultimate facts may be drawn in favor of the responding party, then the moving party cannot obtain summary

---

7. Plaintiffs' Complaint, although convoluted in nature, essentially claims that the Defendants, Government, Police Department, Gordon and Scelsi all wrongfully conspired to deprive the Plaintiffs of their personal freedom and reputation and caused them physical and emotional trauma. *Id.*, ¶ 33.

8. The Defendants have raised the challenge that if the Court dismisses the federal law claims raised under 42 U.S.C. § 1983 and § 1985, the pendent state law claims must be dismissed for want of jurisdiction. *See* D.I. 50 at 29. This

argument is addressed squarely at Section III(E), *infra*.

9. Count III is the only count that alleges damage to Plaintiff Mr. House and is a state tort law claim for loss of consortium. Counts V and VI raise state law tort claims for intentional infliction of emotional distress and negligent infliction of emotional distress, respectively. Lastly, Counts VII and VIII raise the state law tort claims of assault and battery as to Plaintiffs Mrs. House and Amecra, respectively.

judgment. *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 258 (3rd Cir.1983), *rev'd on other grounds,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

### A. Dismissal of Plaintiffs' Section 1983 Claim of Excessive Force Against Supervisory Defendant Gordon in His Individual Capacity

A section 1983 action requires that (1) the conduct complained of must be committed by a person acting under color of state law and (2) it must have deprived the plaintiff of a right or privilege secured by the Constitution or laws of the United States. *Riley v. Jeffes,* 777 F.2d 143, 145 (3rd Cir.1985) (citing *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). There is no dispute that Defendant Gordon is a state actor and neither he nor any of the other Defendants have complained that the Plaintiffs are without a liberty interest in freedom from unjustified bodily harm. *Accord, Ingrahm v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977) ("[a]mong the historic liberties ... protected [by the Due Process Clause] was a right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security"). Thus, the resolution of the motion for summary judgment rests on whether the depositions, answers to interrogatories, admissions on file and affidavits, if any, show there is a genuine issue of material fact essential to prove that the Defendant Gordon deprived the Plaintiffs of their constitutional rights.

■ The Complaint does not identify Defendant Gordon as being present during the alleged attack on Mrs. House nor does it allege any affirmative knowledge or active involvement by this Defendant. Rather,

Plaintiffs' claims against this Defendant are essentially brought under the theories of supervisory liability and *respondeat superior.*

In the only averment in the Complaint specifically making reference to the conduct of supervisory Defendant Gordon, the Plaintiffs claim that Gordon should be held liable for his *failure to train* police officers "to use only reasonable force when necessary; to insure that witnesses to arrest are not purposely harmed; to insure that young children are not harmed by officers' actions; [and] how to adequately use a stun gun on a victim." D.I. 1, ¶¶ 34(b).[10] Additionally, the Plaintiffs argue simplistically that Gordon is automatically liable for any constitutional or civil rights violations committed by Defendant Scelsi by virtue of his position as a supervisor. *See* D.I. 52 at 30 (referencing the Police Department's own directives, the Plaintiffs argue that Defendant Thomas Gordon cannot escape liability simply because he was not present at the scene because as Police Chief he is ultimately responsible for all actions taken by his subordinates).

In the first instance, Plaintiffs' conclusory allegations related to Defendant Gordon do not in any meaningful way allege *specific* conduct on his part that satisfies the heightened specificity standard for claims of supervisory liability. *Accord, Chudzik v. City of Wilmington,* 809 F.Supp. 1142 (D.Del.1992) (Plaintiffs' charges against two supervisory defendants in their individual capacities that defendants failed to properly train their officers and otherwise engaged in acts and omissions that yielded constitutional violations dismissed by this Court for patent lack of specificity on the part of the plaintiffs); *Bush v. City of Wilmington,* C.A. No. 89–628–JRR, Roth, J. (D.Del. August 23, 1990) (plaintiffs' claims against the supervisory defendants dismissed for failure to meet the heightened specificity requirement for civil rights complaints).[11] While the involvement of Defen-

---

10. *See supra,* note 6. Additionally, this averment reflects a part of the Plaintiffs' claim against the municipal Defendants (Government and Police Department) and the individual Defendants in their official capacities (Gordon and Scelsi) of an unconstitutional "policy" or "custom" discussed *infra* at Section III(B).

11. In *Bush,* plaintiffs alleged that white police officers entered into the plaintiffs' home without cause or provocation and beat the plaintiff, a black male, for discriminatory motives. Like the case presently before this Court, the plaintiffs there alleged without any tangible factual support much more significant and detailed links

dant Gordon may be shown through allegations that he personally directed the unlawful conduct alleged against Defendant Scelsi or had actual knowledge of and consented to that conduct, such allegations must be made with the necessary particularity. *See Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3rd Cir. 1988) (citations omitted). Nowhere in the Complaint, D.I. 1, the Plaintiffs' Answering Brief, D.I. 52, or the record do the Plaintiffs provide a factual basis demonstrating on even a cursory level that this Defendant was involved or acquiesced in Defendant Scelsi's alleged misconduct. *See Bush,* C.A. No. 89–628–JRR at 7. Moreover, Defendant's mere supervisory position over Officer Scelsi is irrelevant for purposes of his individual liability. *Rode,* 845 F.2d at 1208.

■ Furthermore, like the deficient plaintiffs in *Chudzik,* the bare-bones pleading put forth by the Plaintiffs here cannot be said to have satisfied the Third Circuit's specific standards for the imposition of supervisory liability. *See Chudzik,* 809 F.Supp. at 1148. The standard for holding supervisory public officials liable under 42 U.S.C. § 1983 has been defined by the Third Circuit in *Sample v. Diecks,* 885 F.2d 1099 (3rd Cir.1989). Extending the Supreme Court's holding in *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989) beyond municipal entities to supervisory personnel, the Third Circuit in *Sample* concluded that "a 'person' is not the 'moving force [behind] the constitutional violation' of a subordinate, unless that 'person' . . . has exhibited deliberate indifference to the plight of the person deprived." *Sample,* 885 F.2d at 1118.

To hold a supervisory official liable, the plaintiff must: (1) identify with particularity what the supervisory official failed to do that demonstrates his deliberate indifference; and (2) demonstrate a close causal relationship between the identified deficiency and the ultimate injury. *Id.* at 1118; *City of Canton,* 489 U.S. at 387, 109 S.Ct. at 1204.

Here, construing Plaintiffs' claim in its most favorable light, Plaintiffs have still not in any manner identified with particularity what this Defendant did that indicates deliberate indifference. Plaintiffs have put forth no *factual* support for a claim that this Defendant acted with deliberate indifference towards their plight. Therefore, Plaintiffs have not raised a genuine issue of material fact so as to survive this motion for summary judgment. Consistent with the settled doctrine that traditional concepts of *respondeat superior* do not apply to civil rights actions arising under section 1983, Plaintiffs claim against Defendant Gordon in his individual capacity must be dismissed on the pleadings. *Accord, Rizzo v. Goode,* 423 U.S. 362, 375–76, 96 S.Ct. 598, 606, 46 L.Ed.2d 561 (1976); *Gay v. Petsock,* 917 F.2d 768, 771 (3rd Cir.1990); *Heine v. Receiving Area Personnel,* 711 F.Supp. 178, 186–88 (D.Del.1989).[12]

**B. *Dismissal of All of Plaintiffs' Section 1983 Claims Against Defendants Government and Police Department and Defendants Gordon and Scelsi in Their Official Capacities for Failure to Demonstrate the Required Official Custom or Policy***

■ It is well established that a municipality cannot be held liable under section

between the supervisory defendants and the officers who engaged in the alleged wrongful conduct. In particular, *inter alia,* plaintiffs alleged that: (1) the supervisory defendants failed to supervise the police officers; (2) the supervisory defendants knew that the defendant police officers and other police officers had beaten and maliciously prosecuted citizens on previous occasions without probable cause; (3) the beating of the plaintiff was done at the direction of the supervisory defendant; (4) the supervisory defendants encouraged such acts in order to make an example out of the plaintiff and to generate publicity; (5) such actions were the *de facto* policy, procedure and custom of the Wilmington Police Department; and (6) it was the policy of the City of Wilmington not to investigate complaints by minorities of the use of excessive force by police.

Despite these far-reaching allegations and the court's awareness of the difficulty plaintiffs face in attempting to redress civil rights claims, that court granted defendants' motion for judgment on the pleadings finding that "[i]t is not asking too much for plaintiffs to come forward with more than the conclusory allegations confronting the Court." *Id.* at 8. As to Defendant Gordon, this Court's opinion is in accordance with the holding in *Bush* in that it requires more than sweeping allegations ungrounded in fact. *See Chudzik,* 809 F.Supp. at 1147 n. 13.

12. In light of this conclusion, the Court expresses no opinion as to Defendants' position that Defendant Gordon is entitled to qualified immunity. D.I. 50 at 26 n. 8.

484

1983 based on a theory of *respondeat superior*. *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To state a civil rights claim against the New Castle County Government or New Castle County Police Department, the Plaintiffs must present evidence that the allegedly unconstitutional activities of the police officers were pursuant to a "policy statement, ordinance, regulation or decision officially adopted and promulgated by [the County's] officers." *Id.* at 690, 98 S.Ct. at 2036.[13] "The execution of a government policy or custom must inflict the injury and be the moving force behind the alleged constitutional violation." *Cooper v. Merrill*, 736 F.Supp. 552, 566 (D.Del.1990) (citing *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037; *City of Canton*, 489 U.S. 378, 109 S.Ct. 1197 (need direct causal link between policy and alleged constitutional deprivation). Further, in an official capacity suit, "the entity's 'policy or custom' must have played a part in the violation of federal law." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (citations omitted).

Throughout the Complaint, Plaintiffs consistently make sweeping references to what they perceive to be the County of New Castle and Police Department's unconstitutional "custom" and "policy" that resulted in the infliction of the constitutional violations against them. D.I. 1, ¶¶ 28, 34 and 35. At the heart of Plaintiffs' claim of an unconstitutional custom or policy is the charge that the Defendants violated Plaintiffs' *constitutional* rights by failing to adequately train their police officers (1) to use only reasonable force when necessary; (2) to insure that witnesses to an arrest are not purposely harmed; (3) to insure that children are not harmed by an officer's actions; and, (4) to adequately train an officer as to how to use a stun gun. *Id.*, ¶ 34. Further, Plaintiffs allege that this policy (1) encouraged the alleged excessive force

by Officer Scelsi when Defendants knew or should have known that Officer Scelsi should not be allowed to arrest individuals; (2) inflicted harm upon black suspects for no just reason other than the fact that they are black; and (3) allows officers with a history of problems with black individuals to become involved with black individuals alone. *Id.*

■ Initially, the Court observes that Plaintiffs' race-related, inadequate training and policy claims are allegedly violative of the Equal Protection Clause of the fourteenth amendment. The Court finds these claims to be utterly baseless as neither the Complaint nor any part of the record offers any facts that even remotely suggest that Plaintiffs received treatment that was different from others similarly situated on account of their race. *See, Andrews v. City of Philadelphia*, 895 F.2d 1469 (3rd Cir.1990) (to establish a claim under section 1983 for denial of the equal protection clause, plaintiffs have the burden of demonstrating that they received treatment that was different from other similarly situated individuals). In fact, throughout the discovery period, the Plaintiffs' consistently admitted that there is a lack of such evidence. *See* D.I. 52 at 28; D.I. 51 at 67 (Plaintiff Mr. House admits having no factual basis for claiming that there is a policy of inflicting harm upon black suspects simply because they are black); *Id.* at 87–91 (Plaintiff Mrs. House admits having no knowledge of Defendant Scelsi having a history of problems with black citizens and no knowledge of a policy that placed officers with a history of problems with black citizens in to situations involving black citizens).[14] Accordingly, even assuming all the facts in the Complaint to be true, summary judgment is appropriately granted as to Plaintiffs' claim of a policy or custom violative of the equal protection clause.[15]

13. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Bush*, C.A. No. 89–628–JRR at 9 (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037).

14. In fact, the record is devoid of any evidence that suggests that Officer Scelsi has ever had problems with black citizens prior to this incident.

15. The Court rejects Plaintiffs' belated plea that the Court "allow Plaintiffs' equal protection claim to stand until all discovery within the Defendants' control is given to Plaintiff." D.I. 52 at 28. In the first instance, contrary to the Plain-

Consequently, the only "custom" or "policy" questions that the Court need resolve are (1) whether the municipal Defendants, the Government and the Police Department, have established a custom or policy that promotes the unconstitutional use of excessive force by its officers and (2) if such a policy exists, whether there is a genuine issue of fact that this policy actually caused Defendant Scelsi to use the excessive force alleged by the Plaintiffs.

■ "[I]nadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388, 109 S.Ct. at 1204. For a failure to train charge to be considered a policy or custom actionable under section 1983, the municipality must make a conscious or deliberate choice not to train its officers. *Id.* at 389, 109 S.Ct. at 1205.

■ In support of their inadequate training charge, Plaintiffs point to the Police Department's own "Directives" in the Code of Conduct Manual issued to all police officers as embodying the alleged policy of inadequate training. D.I. 52 at 22. In particular, Plaintiffs' cite to Section 2.39 of the Manual which states:

> USE OF FORCE: No member of the Department shall use excessive or unreasonable force in the performance of his or her duty.
>
> Definition: Excessive/Unreasonable Force: Force which exceeds that necessary in order to accomplish a lawful objective.

D.I. 53 at 21.

Plaintiffs contend that although the directive facially professes that officers not engage in excessive force, "the discussion is so short and vague as to give rise to each officers' subjective formulation of the meaning of excessive force." D.I. 52 at 22. Further, Plaintiffs argue that "[s]uch cursory

attention given by Defendant Police Department to such an important issue gives rise to deliberate indifference towards persons with whom the police officers come in contact, i.e. potential arrestees." *Id.* at 23. Ultimately, Plaintiffs conclude that "[t]he need for the use of force by enforcement agents in effectuating arrests of citizens can be described as *so obvious* that failure to [train] could properly be characterized as deliberate indifference to constitutional rights and actionable under Section 1983." *Id.* at 24 (citing *City of Canton*, 489 U.S. at 390 n. 10, 109 S.Ct. at 1205 n. 10) (emphasis added) (quotations omitted).

Plaintiffs have failed to develop sufficient *factual* evidence to survive Defendants' motion for summary judgment. In the first instance, there has been absolutely no evidence, direct or circumstantial, developed by the record demonstrating that the Police Department made a conscious or deliberate choice not to train its officers. *See, City of Canton*, 489 U.S. at 389, 109 S.Ct. at 1205. Plaintiffs' conclusory allegation that the regulations concerning use of force are so ambiguous as to represent a conscious choice not to train police officers does not amount to factual support for an improper training claim as Plaintiffs have failed to specify any particular deficiencies in the training program. Moreover, Plaintiffs have offered nothing to counter the evidence in the record demonstrating the extensive training officers received as relates to the methods and levels of force to be used in effectuating arrests. *See* D.I. 53 at 25–28 (Police Department Directive dated July 7, 1988, describing in significant detail the overriding policies surrounding the use of force, the level of force to be used in given circumstances, the appropriate circumstances for use of the stun gun, the police batons and deadly force and the unauthorized uses of the police equipment); D.I. 51 at 34, 40–41 (Officer Scelsi's deposition testimony indicates that he received training in the academy on the manner in which to approach suspects and was specifically

tiffs' assertions, discovery has been completed in this matter and Plaintiffs have apparently been provided with all the information to which they are entitled. D.I. 54 at 8. Moreover, Plaintiffs, represented by counsel, could have supplemented the

record by making a formal motion requesting discovery under the Federal Rule of Civil Procedure 56 but failed to take advantage of this opportunity. *Accord, Chudzik*, 809 F.Supp. at 1152 n. 24.

trained on the use of force during an arrest).[16] In the absence of any evidence showing that the municipality was put on notice that there was a need for more training concerning the appropriate police response to citizen complaints of loud radio playing, the Court must exercise restraint in finding that the Plaintiffs have raised a fact question as to the "obvious" need for greater training. *See Fulkerson v. City of Lancaster*, 801 F.Supp. 1476, 1483 (E.D.Pa.1992) (in granting · municipal defendants motion for summary judgment based on the absence of scienter-type evidence of a failure to train, the court held that "[w]e must be cautious about finding that a need is 'obvious' absent a history of violations, lest the federal courts become engaged in an endless exercise of second-guessing municipal employee-training programs") (quoting *City of Canton*, 489 U.S. at 391, 109 S.Ct. at 1206).

Furthermore, as conceded by Plaintiffs, the written policy concerning the use of force to which the Plaintiffs' refer was undoubtedly constitutional on its face. In the absence of any unconstitutional statute or rule, it is the Plaintiffs' burden to articulate a factual basis that demonstrates considerably more proof than a single incident. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985).

Here, as indicated, Plaintiffs have not acquired any factual evidence to buttress their broad allegations of improper training. Rather, Plaintiffs have essentially alleged a single incident of misconduct by Officer Scelsi combined with the conclusory allegations that these activities are reflective of some nebulous .official policy designed to promote excessive force. "Single incidents of misconduct, when joined with broad allegations of a policy or custom do not give rise to liability for municipalities." *Chudzik*, 809 F.Supp. at 1150, citing *Tuttle*, 471 U.S. at 824, 105 S.Ct. at 2234 and *Bush*, C.A. No. 89–268–JRR at 10–11.

Accordingly, the Court finds that even when construing Plaintiffs' Complaint in its most favorable light, the Plaintiffs have failed to raise a genuine issue of fact concerning the existence of an unconstitutional policy that requires the Court to allow the case be heard by a jury.[17] Having found no genuine issue of fact on the question of the existence of an actual policy or custom, the Court need not reach the issue of whether the policy or custom alleged by the Plaintiffs actually caused Defendant Scelsi to use the excessive force alleged by the Plaintiffs. Consequently, summary judgment is granted as to the Government and the Police Department.[18]

**16.** Specifically, Defendant Scelsi described his training on the use of force to be employed in effectuating an arrest as:

> Basically your use of force, you're trained to use the force that's necessary to affect the arrest. Basically you would start your verbal commands, then it would go to the physical hand on type thing. If the person is still not cooperating, then you would escalate further if you needed further force to make the apprehension. At that point in time it would be reverting to your Nova stun gun device. If that failed and there was still, if you assume there's a struggle or a fight, then you would escalate to your baton. From that point it would just escalate until the arrest was made. D.I. 51 at 41.

**17.** Summary judgment is also appropriate as to Plaintiffs' completely unsubstantiated charge that the alleged "policy" of these Defendants promoted unconstitutional conduct by police officers in that officers like Defendant Scelsi were reasonably led to· believe that in making arrests they could employ excessive force with impunity because of the likelihood that complaints of illegal arrest and excessive force would not be thoroughly and fairly investigated. D.I. 1, ¶ 35. Put

simply, Plaintiffs have adduced *no* evidence in their favor on this unsupported factual allegation from their pleadings, thus mandating summary judgment. *Accord, Chudzik*, 809 F.Supp. at 1149–50 (plaintiffs' claim that proceedings for officers charged with police misconduct demonstrated a policy which actually promoted unconstitutional excessive force by police officers dismissed on motion for summary judgment for lack of any factual support for the claim).

Furthermore, to the extent that this charge, not even mildly supported by the Plaintiffs in their Answering Brief, was also intended to be raised against Defendant Gordon in his individual capacity as well as his official capacity, summary judgment as to this charge is also granted in his favor.

**18.** The Court also grants summary judgment as to *Defendants Scelsi and Gordon in their official capacities*. Because the Officers, when acting in their official capacity are essentially implementing the policies and customs of the municipality, Plaintiffs' failure to plead a valid cause of action against the municipality demands dismissal of the section 1983 claims against the officers in

## C. Plaintiffs' Section 1983 Excessive Force Claims Against Officer Scelsi in His Individual Capacity

Plaintiffs have raised a section 1983 claim against Officer Scelsi in his individual capacity. Plaintiffs contend that in the process of arresting Mrs. House, Officer Scelsi employed unreasonable and excessive force on both her and her daughter Ameera. *See* D.I. 52 at 18–20.

### 1. Plaintiff Mrs. House's Section 1983 Excessive Force Claim Against Defendant Scelsi

■ The Supreme Court has held that a citizen's claim that law enforcement officials used excessive force in the course of making an arrest or other "seizure" is properly analyzed under the fourth amendment rather than under a substantive due process standard. *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 1867, 104 L.Ed.2d 443 (1989).[19] In *Graham*, the Supreme Court held that claims alleging use of excessive force by police officers in making an arrest are to be analyzed under the fourth amendment's "objective reasonableness" standard. *Id.* A determination of whether the force used in a given instance is reasonable under the fourth amendment requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. at 1871 (citations omitted).[20]

■ Although there is no precise definition of the test of reasonableness, factors to be taken into account include (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985)). Moreover, *Graham* instructs that

> [t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1872 (citation omitted). Finally, the "reasonableness" inquiry in an excessive force case is an objective one, *i.e.*, whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him without regard to his underlying intent or motivation. *Id.* at 397, 109 S.Ct. at 1872.

■ In his motion for summary judgment, the Defendant Scelsi argues that the section 1983 claim against Officer Scelsi in his individual capacity should be dismissed because the force used to overcome Mrs. House's resistance to arrest and to place her under arrest was objectively reasonable and did not rise to a violation of the fourth amendment. In support of the motion, Defendants contend that Mrs. House exhibited a belligerent attitude towards the police officers[21] and that "[t]he unrebutted testimony

their official capacities. *See, e.g., Monell*, 436 U.S. at 690 n. 55, 98 S.Ct. at 2035 n. 55; *Bush*, C.A. No. 89–268–JRR.

19. Thus, Plaintiffs' argument that allegations of excessive force can be brought under the fifth and fourteenth amendments is without merit and is properly dismissed. *See* D.I. 52 at 26–27.

20. The Supreme Court observed that "[o]ur Fourth Amendment jurisprudence has long recognized that the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* 490 U.S. at 396, 109 S.Ct. at 1871 (citing *Terry v. Ohio*, 392 U.S. 1, 22–27, 88 S.Ct. 1868, 1880–83, 20 L.Ed.2d 889 (1968)).

21. Defendants' version of the events on the night in question is that in response to the officers request to turn down the radio Mrs. House and, to a lesser degree, Mr. House reacted with profanity and a general attitude aimed at confrontation. D.I. 51 at 17 (describing the incident, Defendant Scelsi testified that in response to Officer Liebesman's polite request that the radio be turned down, Mrs. House exclaimed "[N]o one is going to tell us what the f* *k to do"). To further support Mrs. House's alleged belligerence throughout the process of her arrest, Defendants rely on the affidavits of neighbors Bernice J. Guy and Lamonte E. Booker. D.I. 51 at 1–3 (Guy Affidavit) and 6–7 (Booker Affidavit).

of Officer Scelsi shows that [Mrs. House] assaulted him." D.I. 50 at 15.[22] Defendants also point to the fact that Mrs. House pled guilty to the charges of disorderly conduct. *Id.* at 16. In total, Defendants posit that in light of the circumstances confronting him at the time of the incident, Officer Scelsi's use of the stun gun, described as the "only" use of force by Officer Scelsi, was undoubtedly objectively reasonable and that therefore Plaintiffs' claim must fail as a matter of law. *Id.* at 15–16.

In opposition to the Defendants' motion, Plaintiffs allege a markedly different version of the facts. Plaintiffs contend that upon opening their door they were greeted with profanity by Officer Liebesman who threatened to arrest them if the volume on the radio was not reduced.[23] Plaintiffs charge that they had already turned down the music, that they were doing nothing to provoke Defendant Scelsi and that they were simply attempting to clarify the situation when he forcibly entered his way into their apartment by sticking his flashlight into the door of their apartment as they were about to close it. D.I. 52 at 18.[24]

Furthermore, contrary to the claims by the Defendants that the only use of force was the employment of the stun gun device, Plaintiffs' claim that Officer Scelsi forcibly handled Mrs. House by throwing her up against a wall and continuously kneed her in the buttocks. *Id.* at 19. They also posit that Mrs. House is much smaller than Defendant Scelsi and that therefore he needlessly employed his stun gun to effectuate the arrest. *Id.* Plaintiffs thereby conclude that the amount of force used by Officer Scelsi, including but not limited to the employment of the stun gun three times, was "unnecessary and clearly excessive." *Id.*[25]

The total record before the Court indicates that there are genuine issues of material facts in dispute as they relate to the standards for excessive force as established by the Supreme Court in *Graham.* "A factual dispute is 'genuine' if a reasonable jury could return verdict for the non-movant." *Schwab v. Wood,* 767 F.Supp. 574, 579, (1991), *citing Williams v. Borough of West Chester,* 891 F.2d at 460–61 (non-movant must produce more than a scintilla of evidence to successfully oppose summary judgment). In this

**22.** Specifically, Officer Scelsi contends that while Mrs. House was being arrested in the hallway to the apartment, Mr. House became loud and disorderly and that while he was making sure his partner on this night, Officer Liebesman, was not in danger, Mrs. House punched him in the face with a closed fist. D.I. 51 at 24. Defendant Scelsi also testified under oath that this punch by Mrs. House split his lip and that he was bleeding. *Id.* at 30. Additionally, the Defendants point to the affidavit submitted by Officer Rebecca Spanich who, upon inquiring as to how it came to be that Defendant Scelsi's lip was bleeding, heard Mrs. House exclaim "Yeah bitch, I hit him!" D.I. 55 at 2, ¶ 6 (Spanich Affidavit).

**23.** Both Mrs. and Mr. House have sworn under oath that Officer Liebesman said something to the effect of "turn the f* * * * * * music down or I'm going to take your ass downtown." D.I. 53 at 34(a), 62. See, supra, note 3.

**24.** In support of this position, the Plaintiffs have provided the affidavit of Uta Ennis, D.I. 53 at 1–3, as well as the sworn testimony of Mrs. and Mr. House. A synopsis of their position is that Mrs. House said something to her husband along the lines of "forget them" and that Defendant Scelsi took exception to the statement indicating that he could arrest them. When Mrs. House allegedly inquired as to why they could be arrested, Defendant Scelsi proceeded to arrest her, setting off

the course of excessive force the Plaintiffs have alleged.

Plaintiffs also vehemently deny that Mrs. House made the profane statement "no one is going to tell us what the f* * * to do" but argue that even if that statement was made, in so much as the radio had been shut off and the fact that Officer Liebesman had apparently already walked away from the door, Officer Scelsi's forceful entry into the Plaintiffs' apartment and the subsequent force he used during the course of the arrest of Mrs. House was still unreasonable. D.I. 52 at 9–10 (citing Officer Scelsi's deposition testimony that police officers are held to a higher standard and should not simply arrest someone for directing an obscenity towards them. D.I. 53 at 74).

**25.** Plaintiffs also take issue with Defendants' charge that the "unrebutted testimony of Officer Scelsi shows that [Mrs. House] assaulted him. D.I. 50 at 15." D.I. 52 at 7. In particular, Plaintiffs contend that Mrs. House's sworn deposition testimony uncategorically denies the fact that she intentionally hit Officer Scelsi in the face and that the only time she might have struck him was while she was falling down unconscious *after* she had been shocked by Officer Scelsi's stun gun. *Id.,* citing Mrs. House's deposition testimony. D.I. 53 at 52, 53.

case, there exist fact questions as to (1) whether Mrs. House posed a safety threat to Officer Scelsi; (2) the level of active resistance being offered by Plaintiff Mrs. House; and (3) whether she was in any way attempting to flee.

In the face of these competing factual accounts, the Court must make all inferences and view all evidence in a light most favorable to the non-moving party Plaintiffs. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510; *Baker v. Lukens Steel Co.*, 793 F.2d 509, 511 (3rd Cir.1986). Accordingly, the Court is precluded from granting summary judgment in favor of Defendant Scelsi because if the factfinder credits Plaintiffs' version of Officer Scelsi's conduct prior to and during the course of the arrest rather than that of Defendants', it is possible that they may find that Defendant Scelsi's conduct was unnecessary and unreasonable. *See Cooper*, 736 F.Supp. at 559–60. *Accord, Pollack v. County of New Castle, et al.*, C.A. No. 90–688–RRM at 1, ¶ 2, McKelvie, J. (Order of June 2, 1992) (in a section 1983 action claiming excessive force under the fourth amendment by an individual officer for his use of a stun gun in response to a complaint involving loud radio playing, court ordered that summary judgment motion by individual officer be denied and that the case be set for trial);

*cf. Schwab*, 767 F.Supp. at 585. As such, Defendant Scelsi's request for summary judgment on the section 1983 excessive force claim on the grounds that under the standards in *Graham* his conduct was reasonable and warranted under the circumstances is properly denied.[26]

## 2. Defendant Scelsi's Qualified Immunity Argument

Defendant Scelsi argues that even if the Court rejects his argument that his conduct was objectively reasonable thereby warranting summary judgment under the standards enunciated in *Graham*, he is still entitled to summary judgment on the independent ground of "qualified immunity." D.I. 50 at 25–26. The Court does not agree.

 State officials performing discretionary functions are generally protected from liability for civil damages to the extent that their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 817, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982).[27] In undergoing a qualified immunity analysis, the Court must determine whether a reasonable person could have believed that the defendant's actions were lawful in light of clearly estab-

---

**26.** The Court notes that this decision is easily reconcilable with its most recent decision in *Hendon v. Crane*, C.A. No. 91–443–LON (D.Del. March 2, 1993). In *Hendon*, this Court granted the Defendants' motion for summary judgment where the Plaintiff brought a section 1983 action for excessive force. In resolving the motion for summary judgment in that case, the Court was confronted with uncontroverted affidavits from the party defendants reflecting the facts that the plaintiff was a threat to the safety of the officers and was unquestionably attempting to flee when apprehended. The plaintiff in that case did not submit any counteraffidavits but rather relied solely on his pleadings. In resolving the summary judgment motion the Court was required to take the factual averments of the defendants as true and therefore found that the force used was objectively reasonable under the *Graham* standards.

The Court notes in the first instance that the underlying crime at issue here was disorderly conduct arising out of a complaint of loud radio playing in the early evening of New Year's Eve and, that standing alone, this offense is not overly serious. Moreover, unlike the facts in *Hendon*,

neither party here has presented party affidavits. Instead they rely on the sworn testimony from their respective depositions as well as affidavits from witnesses. Lastly, and most significantly, unlike the plaintiff in *Hendon*, the Plaintiffs in this case did *not* simply rest on the allegations of their complaint without any significant probative evidence tending to support the allegations. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510. Rather, they have raised genuine factual disputes by pointing to the depositions and affidavits on file. As such, the Plaintiffs have met their burden of coming forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

**27.** The right which the government official is said to have violated must be clearly established. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). A right is clearly established if the shape of that right was sufficiently clear at the time of the alleged violation, such that a reasonable officer would understand that the actions taken violate the right. *Id.* at 639, 640, 107 S.Ct. at 3038, 3039.

lished law and information possessed by the defendant at the time of the incident. *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039; *Henry v. Perry,* 866 F.2d 657, 659 (3rd Cir. 1989). The "pertinent inquiry is confined to the objectively ascertainable question of whether a reasonably well-trained officer would know that the ... use of force ... [was] illegal." *Schwab,* 767 F.Supp. at 588.

Furthermore, "[a] plaintiff can overcome a qualified immunity claim by showing the right allegedly violated was clearly established and that there exists a genuine issue as to whether the defendant committed acts in violation of that clearly established law." *Cooper,* 736 F.Supp. at 560, *citing Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). At the time of this incident, the Plaintiffs undoubtedly enjoyed a clearly established right to be free from excessive force. In light of the present record as adduced by both parties and the inferences to be drawn therefrom, two versions of the incident in question are possible. *Accord, Cooper,* 736 F.Supp. at 560. Consistent with the Court's holding that there exists genuine issues of material fact on the present record, the Court cannot at this stage of the proceedings hold as a matter of law that the force employed by Defendant Scelsi was either reasonable or exerted in good faith in the performance of his official duties.

Additionally, if the Plaintiffs' version of the events is believed, a reasonable jury could find that a reasonably well-trained officer in Defendant Scelsi's position would not believe in the reasonableness of his actions. Accordingly, Defendant Scelsi's application for qualified immunity for the present suit is properly denied. *See Schwab,* 767 F.Supp. at 591 (the court denied summary judgment motion based on claim of qualified immunity holding that the fact-finder must resolve the question of whether the individual officer acted "reasonably and with justification with respect to

the exertion of force during the incident") (*citing Cooper,* 736 F.Supp. at 560–61).

### 3. *Plaintiff Ameera's Section 1983 Excessive Force Claim*

Plaintiff Mrs. House has also raised a section 1983 claim of excessive force against Defendant Scelsi on behalf of her minor daughter, Ameera. As previously noted, claims of excessive force are treated under an analysis established in *Graham.*[28] That analysis, however, is only triggered when the victim has in some way been "seized" within the meaning of the fourth amendment. A "seizure" has occurred "only when there is a governmental termination of freedom of movement *through means intentionally applied.*" *Brower v. Inyo County,* 489 U.S. 593, 597, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (emphasis in original). "Whenever an officer restrains the freedom of a person to walk away he has seized that person." *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985).

Defendant Scelsi's principal argument is that given the facts as alleged in the Complaint, no arrest or seizure occurred implicating this Plaintiff's fourth amendment rights because there was no intentional act on his part which resulted in Plaintiff Ameera's injury. *See Troublefield v. City of Harrisburg,* 789 F.Supp. 160, 162 (M.D.Pa.), *aff'd without opinion,* 980 F.2d 724 (3rd Cir.1992). In particular, Defendant Scelsi claims that he *unintentionally* pushed Ameera one time as he was reacting to someone unknown to him at the time (allegedly Ameera) attempting to grab his service weapon while he was in the process of arresting and securing Plaintiff Mrs. House outside the apartment. D.I. 50 at 7–8 n. 2; D.I. 51 at 22–23, 36 (Officer Scelsi's deposition testimony discussing how he responded when he felt someone grabbing at his gun).[29] As a result of these facts, Defendants conclude that Plaintiff Ameera's section 1983 claim is meritless because there

---

**28.** To the extent that the Plaintiffs are bringing their claim for excessive force relating to Ameera under the fifth and fourteenth amendments, for the reasons discussed at Section III(C)(1), *infra,* that claim is dismissed.

**29.** Defendant also contends that contrary to the claims of the Plaintiffs in the Complaint, he did in fact notice that Ameera got right back up from her fall and that she was not really injured. D.I. 51 at 23.

is no underlying constitutional violation. D.I. 50 at 11–12.

Once again, the Plaintiffs have posited a different version of Officer Scelsi's conduct, this time in connection with Plaintiff Ameera. Plaintiffs argue that during the course of the arrests of Mrs. and Mr. House, Officer Scelsi utilized unreasonable and excessive force on their seven year old daughter. *See* D.I. 52 at 19–20. In particular, the Plaintiffs aver that during the course of the incident in question, on two separate occasions Officer Scelsi knowingly, intentionally and viciously shoved Ameera Evans backwards when, out of fear to what was happening to her mother, she approached the Defendant. D.I. 1, ¶¶ 11–13, 17.[30] Plaintiffs further contend that in response to the first shove, Ameera fell over a table, *Id.* at 13, and in response to the second shove, she crashed into the railing causing her to fall down and cry. *Id.* at 17.[31] Lastly, Plaintiffs claim that as a result of this alleged assault by Officer Scelsi, Ameera has suffered emotional and physical trauma. *Id.*, ¶ 22.

In support of these facts, Plaintiffs argue that whether or not Defendant Scelsi intended to harm Plaintiff Ameera is irrelevant. D.I. 52 at 16. Rather, Plaintiffs contend that it is enough that Defendant Scelsi actually intended the violent acts that produced the harm. *Id.*, *citing Glasco v. Ballard,* 768 F.Supp. 176, 179 (E.D.Va.1991) ("it is irrelevant whether the police officer intended to brutalize a suspect or merely intended to discipline him, but it is still relevant whether the officer intended the underlying act at all") and *Troublefield,* 789 F.Supp. at 164 (citing *Glasco,* the Court indicated that "whether a law enforcement official voluntarily chose a course of action which harmed a suspect is still relevant; whether he acted intending to harm the suspect, or merely to scare him is not"). Plaintiffs charge that under these standards, a seizure of Ameera

occurred because Defendant Scelsi "voluntarily chose to swing his arm around and push away anyone who was near him." D.I. 52 at 16, citing D.I. 53 at 70(b).

While the Court is wary that "not every injury borne by a citizen at the hands of the government rises to the level of a Constitutional violation", *Troublefield,* 789 F.Supp. at 166, assuming all the facts put forth by the Plaintiffs as true and resolving all inferences to be drawn in favor of the Plaintiffs, the section 1983 claim as it relates to Plaintiff Ameera cannot be dismissed as a matter of law at this stage. Put simply, whether Ameera was actually "seized" remains a question to be resolved by the trier of fact. As such, Defendants' motion for summary judgment as it relates to this claim must be denied.

**D.** *Plaintiffs' Fifth Amendment and Due Process Claims*

■ Plaintiffs broadly contend that they have a valid cause of action under the fifth amendment to the Constitution. As previously indicated, pursuant to the holding in *Graham,* Plaintiffs' excessive force claims are properly analyzed under the reasonableness standard of the fourth amendment and thus, Plaintiffs' allegations of excessive force under the fifth amendment must fail as a matter of law. Furthermore, to the extent that the Plaintiffs are raising some other fifth amendment claim, such a claim must also be dismissed.[32] The fifth amendment's due process protections are limitations upon the *federal* government and have no reference to state action such as that alleged in the instant case. Thus, the Court disregards any claims by the Plaintiffs that they suffered a constitutional deprivation under the fifth amendment.

■ The Plaintiffs' due process claims, if any, fall under the fourteenth amendment. Plaintiffs Mrs. and Mr. House contend that due to their status as parents of Ameera and

---

**30.** In particular, the Plaintiffs contend that Officer Scelsi assaulted Ameera one time inside of the family's apartment and one time after Mrs. House had been physically removed to the hallway outside the family's apartment. D.I. 52 at 11.

**31.** Plaintiffs also contend that at no point did Officer Scelsi stop to inquire as to whether Ameera was injured. D.I. 1, ¶¶ 13, 17.

**32.** Other than their claim of excessive force, Plaintiffs do not state in what way their fifth amendment rights are implicated by the conduct at issue here.

the fact that she suffered injury, they suffered the "loss of companionship" of their child, thereby constituting a cognizable liberty interested protected by the fourteenth amendment. D.I. 52 at 28, *citing Strandberg v. City of Helena*, 791 F.2d 744 (9th Cir.1986) and *Curnow v. Ridge Crest Police*, 952 F.2d 321 (9th Cir.1991). Unlike those cases cited by the Plaintiffs where a "loss of companionship" liberty interest was found where the child died as a result of some action by the respective defendants acting under color of state law, the simple bruise suffered by Ameera "hardly amounts to a loss of companionship." D.I. 54 at 4. *Accord, Tilson v. School District of Philadelphia*, C.A. No. 89–1923, 1989 WL 127510, 1989 U.S.Dist. LEXIS 12582, Shapiro, J. (E.D.Pa. Oct. 24, 1989) (sexual abuse of child did not give rise to a section 1983 action by parent for loss of companionship or society of child). As such, the Court views Plaintiffs' fourteenth amendment claim as being wholly without merit and, therefore, is properly dismissed at the summary judgment stage.[33] The Plaintiffs' claim of emotional distress and suffering in connection with the alleged assault on Ameera is amply treated by the Plaintiffs' state law claims.

### E. Plaintiffs' Pendent State Law Claims

In light of the fact that the Court has denied the Defendants' motion for summary judgment in part, the Court will exercise its supplemental jurisdiction over those claims of infliction of emotional distress and assault and battery arising under state law. Plaintiff Mr. House's claim for loss of consortium (Count III) has apparently been abandoned by the Plaintiffs and to the extent that it has not, it is dismissed on the grounds that at the time of the alleged incident, Mr. and Mrs. House were not husband and wife. *See Gill v. Celotex Corp.*, Del.Super., 565 A.2d 21 (1989). Accordingly, Mr. House is properly dismissed as a Plaintiff.

---

**33.** The Court also notes for the record that to the extent that the Plaintiffs have not abandoned their claims of conspiracy under either 42 U.S.C. § 1983 or 42 U.S.C. § 1985, those claims are dismissed as a matter of law because there is absolutely no evidence in the record to support a cause of action for conspiracy under either of these provisions.

## IV. CONCLUSION

For the reasons contained herein, the Defendants' Motion for Summary Judgment, D.I. 49, is granted in part and denied in part. Summary judgment is granted as to all section 1983 claims raised against Defendant Gordon, the municipal Defendants (Government and Police Department) and Defendant Scelsi in his official capacity. Further, alleged violations under a theory of conspiracy, the Equal Protection Clause, the fifth amendment and the Due Process Clause of the fourteenth amendment are also dismissed against all the Defendants. Summary judgment is denied as to the section 1983 claims of excessive force on behalf of Mrs. House and Ameera against Officer Scelsi in his individual capacity. Because Plaintiffs have established the right to proceed upon these federal claims, they will be permitted to proceed in their state claims, except for the claim of loss of consortium, which is dismissed.